# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA
### CHARLESTON DIVISION

| | |
|---|---|
| **GREENBRIER HOTEL CORPORATION, THE GREENBRIER SPORTING CLUB, INC., GREENBRIER SPORTING CLUB DEVELOPMENT COMPANY, INC., OLD WHITE CHARITIES, INC., OAKHURST CLUB LLC, GREENBRIER GOLF AND TENNIS CLUB CORPORATION, JUSTICE FAMILY GROUP, LLC, THE CHESAPEAKE & OHIO TRAVELER, INC., THE GREENBRIER RESORT & CLUB MANAGEMENT CO., GREENBRIER IA, INC., OLD WHITE CLUB CORPORATION, AND GREENBRIER MEDICAL INSTITUTE, LLC** | Case No. <u>2:19-cv-00118</u><br><br>**COMPLAINT FOR DECLARATORY <u>AND OTHER RELIEF</u>** |
|        **Plaintiffs,** | |
| **v.** | |
| **ACE AMERICAN INSURANCE COMPANY (CHUBB); ACE BERMUDA INSURANCE LTD. (CHUBB); ALLIED WORLD ASSURANCE COMPANY LTD.; AON CLIENT TREATY (AUM); ARCH INSURANCE COMPANY; ASPEN BERMUDA LIMITED; ASPEN SPECIALTY INSURANCE COMPANY; UNKNOWN LEAD UNDERWRITER AT LLOYDS, LONDON-BRIT SYNDICATE; COLONY INSURANCE COMPANY; ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY; EVANSTON INSURANCE COMPANY (MARKEL); IRONSHORE INDEMNITY INC.; IRONSHORE SPECIALTY INSURANCE COMPANY; LANDMARK AMERICAN INSURANCE COMPANY; LIBERTY MUTUAL FIRE INSURANCE COMPANY; LIBERTY SURPLUS INSURANCE CORPORATION;** | |

**UNKNOWN LEAD UNDERWRITERS OF LLOYDS SYNDICATE (TBD):  LLOYDS SYNDICATE AFB, LLOYDS SYNDICATE AMA, LLOYDS SYNDICATE AMT, LLOYDS SYNDICATE ANV, LLOYDS SYNDICATE APL, LLOYDS SYNDICATE ASC, LLOYDS SYNDICATE ATL, LLOYDS SYNDICATE BAR, LLOYDS SYNDICATE BRT, LLOYDS SYNDICATE CHN, LLOYDS SYNDICATE CNP, LLOYDS SYNDICATE HCC, LLOYDS SYNDICATE MKL, LLOYDS SYNDICATE MMX, LLOYDS SYNDICATE MSP, LLOYDS SYNDICATE QBE UK, LLOYDS SYNDICATE RNR, LLOYDS SYNDICATE SJC, LLOYDS SYNDICATE TAL, LLOYDS SYNDICATE TMK; GEORGE ATTIPOE; JAMIE MARTIN; TOM AYTON; SIMON DUKE; SAMANTHA SHAW; STEPHEN CARR; JENNIFER STYLE; MATTHEW NARBETT; MARK LADBROOK; MAPFRE; NOVAE BERMUDA UNDERWRITING LTD; OIL CASUALTY INSURANCE LTD (OCIL); QBE INSURANCE CORP.; RSUI INDEMNITY INSURANCE COMPANY; SOMPO JAPAN INSURANCE CO. OF AMERICA; STARR SURPLUS LINES INSURANCE CO; SWISS REINSURANCE AMERICA CORPORATION; TOKIO MARINE AMERICA INSURANCE COMPANY, LTD; XL CATLIN INSURANCE COMPANY; XL INSURANCE (BERMUDA) LTD; RESORT HOTEL ASSOCIATION, INC.; RESORT HOTEL INSURANCE SERVICES, INC.; RESORT HOTEL INSURANCE COMPANY; BANKERS INSURANCE, LLC; AND VERICLAIM, INC.**

             **Defendants.**

**COMPLAINT FOR DECLARATORY AND OTHER RELIEF**

Plaintiffs, Greenbrier Hotel Corporation ("Greenbrier Hotel"), The Greenbrier Sporting Club, Inc. ("Greenbrier Club"), Greenbrier Sporting Club Development Company, Inc. ("Greenbrier Development"), Old White Charities, Inc. ("Old White"), Oakhurst Club LLC ("Oakhurst"), Greenbrier Golf and Tennis Club Corporation ("Greenbrier Golf"), Justice Family Group, LLC ("Justice Group"), The Chesapeake & Ohio Traveler, Inc. ("Chesapeake"), The Greenbrier Resort & Club Management Co. ("Greenbrier Management"), Greenbrier IA, Inc. ("Greenbrier IA"), Old White Club Corporation ("Old White Club"), Greenbrier Medical Institute, LLC ("Greenbrier Medical") (collectively, Plaintiffs"), by counsel, and for their Complaint for Declaratory and other Relief, respectfully state as follows:

## I.    THE PARTIES, JURISDICTION AND VENUE

### A.    The Parties

1.    Plaintiff Greenbrier Hotel is a for-profit corporation, organized and existing under the laws of the State of West Virginia.

2.    Plaintiff Greenbrier Club is a for-profit corporation, organized and existing under the laws of the State of West Virginia.

3.    Plaintiff Greenbrier Development is a for-profit corporation, organized and existing under the laws of the State of Delaware.

4.    Plaintiff Old White is a not-for-profit corporation, organized and existing under the laws of the State of West Virginia.

5.    Plaintiff Oakhurst is a limited liability company, organized and existing under the laws of the State of West Virginia.

6.     Plaintiff Greenbrier Golf is a for-profit corporation, organized and existing under the laws of the State of West Virginia.

7.     Plaintiff Justice Group is a limited liability company, organized and existing under the laws of the State of Delaware.

8.     Plaintiff Chesapeake is a for-profit corporation, organized and existing under the laws of the Commonwealth of Virginia.

9.     Plaintiff Greenbrier Management is a for-profit corporation, organized and existing under the laws of the Commonwealth of Virginia.

10.     Plaintiff Greenbrier IA is a for-profit corporation, organized and existing under the laws of the State of Delaware.

11.     Plaintiff Old White Club is a for-profit corporation, organized and existing under the laws of the State of West Virginia.

12.     Plaintiff Greenbrier Medical is a limited liability company organized and existing under the laws of the State of West Virginia.

13.     Defendant Ace American Insurance Company (Chubb) is an insurance company organized and existing under the laws of the Commonwealth of Pennsylvania.  Its principal office is located at 436 Walnut Street, Philadelphia, Pennsylvania 19106, and service is made upon its registered agent for service of process Paul Bech, 436 Walnut Street, WAO4K, Philadelphia, Pennsylvania 19106, through the West Virginia Secretary of State

14.     Defendant Ace Bermuda Insurance Ltd. (Chubb) is a Bermuda Corporation.  Its principal office is located at 17 Woodbourne Ave., Hamilton HM 08, Bermuda, and service is

4

made through the West Virginia Secretary of State, State Capitol Building, Charleston, West
Virginia 25305.

15.    Defendant Allied World Assurance Company, Ltd. is an insurance company
organized and existing under the laws of Bermuda.  Its principal office is located at 27 Richmond
Road, Pembroke HM 08, Bermuda and service is made through the West Virginia Secretary of
State, State Capitol Building, Charleston, West Virginia 25305.

16.    Defendant Aon Client Treaty (AUM) is a subsidiary of Aon, a United Kingdom
corporation with an office located at Aon Center, 200 East Randolph Street, Chicago, Illinois
60601 and service is made upon Andy Jenn, COO, Aon Client Treaty, 200 East Randolph Street,
Chicago, Illinois 60601 through the West Virginia Secretary of State, State Capitol Building,
Charleston, West Virginia 25305.

17.    Defendant Arch Insurance Company is an insurance company organized and
existing under the laws of the State of Missouri.  Its principal office is located at 2345 Grand
Blvd., Attn:  M. Gilligan, Kansas City, Missouri 64108, and its West Virginia registered agent
for service of process is Corporation Trust Company, 209 West Washington Street, Charleston,
West Virginia 25302.

18.    Defendant Aspen Bermuda Limited is an insurance company organized and
existing under the laws of Bermuda.  Its principal office is located at 141 Front Street, Hamilton
HM 11, Bermuda and service is made through the West Virginia Secretary of State, State Capitol
Building, Charleston, West Virginia 25305.

19.    Defendant Aspen Specialty Insurance Company is a Delaware corporation with an
address of 175 Capital Blvd., Ste. 300, Rocky Hill, Connecticut 06067 and service is made upon

David Alan Cohen, President, Aspen Specialty Insurance Company, 175 Capital Blvd., Ste. 300, Rocky Hill, Connecticut 06067 through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

20.     Defendant Unknown is Lead Underwriter of Certain Underwriters At Lloyds, London-Brit Syndicate, Reinsurance Policy Number PD-10136-02 issued to Resort Hotel Insurance Company ("RHIC") under Policy Number PAR 2106B1.  RHIC has a principal place of business at 76 St. Paul Street, #500, Burlington, Vermont.  The Registered Agent for RHIC is AON Insurance Managers, Inc., 76 St. Paul Street, #500, Burlington, Vermont 05401 with service of process through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

21.     Defendant Colony Insurance Company is an insurance company organized and existing under the laws of the Commonwealth of Virginia.  Its principal office is located at 8720 Stony Point Parkway, Ste. 400, Richmond, Virginia 23235 and service is made upon any Officer of Colony Insurance Company, 8720 Stony Point Parkway, Ste. 400, Richmond, Virginia 23235 through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

22.     Defendant Endurance American Specialty Insurance Company is an insurance company organized and existing under the laws of the State of Delaware.  Its principal office is 4 Manhattanville Road, Purchase, New York 10577 and its registered agent for service of process is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

23.     Defendant Evanston Insurance Company (n/k/a Markel Insurance Company) is an insurance company organized and existing under the laws of the State of Illinois.  Its principal office is located at 4600 Cox Road, Glen Allen, Pennsylvania 23060 and its Registered Agent for service of process is Kathleen Sturgeon, Evanston Insurance Company (n/k/a Markel Insurance Company), Ten Parkway North, Illinois 60015 through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

24.     Defendant Ironshore Indemnity Inc. is an insurance company organized and existing under the laws of the State of Minnesota.  Its principal office is located at 1010 Dale Street N, St. Paul, Minnesota 55117 and its West Virginia registered agent for service of process is Corporation Service Company, 209 West Washington Street, Charleston, West Virginia 25313.

25.     Defendant Ironshore Specialty Insurance Company is an insurance company organized and existing under the laws of the State of Arizona.  Its principal office is located at 75 Federal Street, Boston, Massachusetts 02110 and service of process is made upon its Registered Agent S. David Childers, Kutak Rock, LLP, 8601 N. Scottsdale Rd., #300, Scottsdale, Arizona 85253 through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

26.     Defendant Landmark American Insurance Company is an insurance company organized and existing under the laws of the State of Oklahoma.  Its principal office is located at 945 East Paces Ferry Road, Suite 1800, Atlanta, Georgia 30326 and service of process is made upon David Ernest Leonard, Chairman and CEO, Landmark American Insurance Company, 945

East Paces Ferry Road, Suite 1800, Atlanta, Georgia 30326 through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

27.     Defendant Liberty Mutual Fire Insurance Company is an insurance company organized and existing under the laws of the Commonwealth of Massachusetts.  Its principal office is located at 175 Berkeley Street, Boston, Massachusetts 02116, and its registered agent for service of process is Corporation Service Company, 84 State Street, Boston, Massachusetts, 02109 through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

28.     Defendant Liberty Surplus Insurance Corporation is an insurance company organized and existing under the laws of the Commonwealth of Massachusetts.  Its principal office is located at 175 Berkeley Street, Boston, Massachusetts 02116, and service is made upon its Registered Agent, Corporation Service Company, 84 State Street, Boston, Massachusetts, 02109 through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

29.     Defendant Unknown is Lead Underwriter of Lloyds Syndicate 4444 by Sompa Canopius subscribing to Policy Number CUAD122 issued to Resort Hotel Association, Inc. ("RHA"). RHA has a principal place of business 2100 East Cary Street, Suite 3, Richmond, Virginia 23223.  The Registered Agent for RHA is Gail Waddell, 2100 East Cary Street, Ste. 3, Richmond, Virginia 23223 with service of process through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

30.     Defendant Unknown is Lead Underwriter of Lloyds Syndicate AFB subscribing to Reinsurance Policy Number WB1600099 issued to RHIC under Policy Number PAR 2106B1.

RHIC has a principal place of business at 76 St. Paul Street, #500, Burlington, Vermont.  The Registered Agent for RHIC is AON Insurance Managers, Inc., 76 St. Paul Street, #500, Burlington, Vermont 05401 with service of process through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

31.     Defendant Unknown is Lead Underwriter of Lloyds Syndicate AMA subscribing to Reinsurance Policy Number WB1600219 issued to RHIC under Policy Number PAR 2106B1. RHIC has a principal place of business at 76 St. Paul Street, #500, Burlington, Vermont.  The Registered Agent for RHIC is AON Insurance Managers, Inc., 76 St. Paul Street, #500, Burlington, Vermont 05401 with service of process through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

32.     Defendant Unknown is Lead Underwriter of Lloyds Syndicate AMT subscribing to Reinsurance Policy Number WB1600199 issued to RHIC under Policy Number PAR 2106B1. RHIC has a principal place of business at 76 St. Paul Street, #500, Burlington, Vermont.  The Registered Agent for RHIC is AON Insurance Managers, Inc., 76 St. Paul Street, #500, Burlington, Vermont 05401 with service of process through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

33.     Defendant Unknown is Lead Underwriter of Lloyds Syndicate ANV subscribing to Reinsurance Policy Number WB1600197 issued to RHIC under Policy Number PAR 2106B1. RHIC has a principal place of business at 76 St. Paul Street, #500, Burlington, Vermont.  The Registered Agent for RHIC is AON Insurance Managers, Inc., 76 St. Paul Street, #500, Burlington, Vermont 05401 with service of process through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

34.     Defendant Unknown is Lead Underwriter of Lloyds Syndicate APL subscribing to Reinsurance Policy Number WB1600199 issued to RHIC under Policy Number PAR 2106B1. RHIC has a principal place of business at 76 St. Paul Street, #500, Burlington, Vermont.  The Registered Agent for RHIC is AON Insurance Managers, Inc., 76 St. Paul Street, #500, Burlington, Vermont 05401 with service of process through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

35.     Defendant Unknown is Lead Underwriter of Lloyds Syndicate ASC subscribing to Reinsurance Policy Number WB1600099 issued to RHIC under Policy Number PAR 2106B1. RHIC has a principal place of business at 76 St. Paul Street, #500, Burlington, Vermont.  The Registered Agent for RHIC is AON Insurance Managers, Inc., 76 St. Paul Street, #500, Burlington, Vermont 05401 with service of process through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

36.     Defendant Unknown is Lead Underwriter of Lloyds Syndicate ATL subscribing to Reinsurance Policy Number WB1600197 issued to RHIC under Policy Number PAR 2106B1. RHIC has a principal place of business at 76 St. Paul Street, #500, Burlington, Vermont.  The Registered Agent for RHIC is AON Insurance Managers, Inc., 76 St. Paul Street, #500, Burlington, Vermont 05401 with service of process through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

37.     Defendant Unknown is Lead Underwriter of Lloyds Syndicate BAR subscribing to Reinsurance Policy Number WB1600197 issued to RHIC under Policy Number PAR 2106B1. RHIC has a principal place of business at 76 St. Paul Street, #500, Burlington, Vermont.  The Registered Agent for RHIC is AON Insurance Managers, Inc., 76 St. Paul Street, #500,

Burlington, Vermont 05401 with service of process through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

38.     Defendant Unknown is Lead Underwriter of Lloyds Syndicate BRT subscribing to Reinsurance Policy Number WB1600126 issued to RHIC under Policy Number PAR 2106B1. RHIC has a principal place of business at 76 St. Paul Street, #500, Burlington, Vermont.  The Registered Agent for RHIC is AON Insurance Managers, Inc., 76 St. Paul Street, #500, Burlington, Vermont 05401 with service of process through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

39.     Defendant Unknown is Lead Underwriter of Lloyds Syndicate CHN subscribing to Reinsurance Policy Number WB1600126 issued to RHIC under Policy Number PAR 2106B1. RHIC has a principal place of business at 76 St. Paul Street, #500, Burlington, Vermont.  The Registered Agent for RHIC is AON Insurance Managers, Inc., 76 St. Paul Street, #500, Burlington, Vermont 05401 with service of process through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

40.     Defendant Unknown is Lead Underwriter of Lloyds Syndicate CNP subscribing to Reinsurance Policy Number WB1600126 issued to RHIC under Policy Number PAR 2106B1. RHIC has a principal place of business at 76 St. Paul Street, #500, Burlington, Vermont.  The Registered Agent for RHIC is AON Insurance Managers, Inc., 76 St. Paul Street, #500, Burlington, Vermont 05401 with service of process through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

41.     Defendant Unknown is Lead Underwriter of Lloyds Syndicate HCC subscribing to Reinsurance Policy Number WB1600099 issued to RHIC under Policy Number PAR 2106B1.

RHIC has a principal place of business at 76 St. Paul Street, #500, Burlington, Vermont.  The

Registered Agent for RHIC is AON Insurance Managers, Inc., 76 St. Paul Street, #500,

Burlington, Vermont 05401 with service of process through the West Virginia Secretary of State,

State Capitol Building, Charleston, West Virginia 25305.

      42.     Defendant Unknown is Lead Underwriter of Lloyds Syndicate MKL subscribing

to Reinsurance Policy Number WB1600126 issued to RHIC under Policy Number PAR 2106B1.

RHIC has a principal place of business at 76 St. Paul Street, #500, Burlington, Vermont.  The

Registered Agent for RHIC is AON Insurance Managers, Inc., 76 St. Paul Street, #500,

Burlington, Vermont 05401 with service of process through the West Virginia Secretary of State,

State Capitol Building, Charleston, West Virginia 25305.

      43.     Defendant Unknown is Lead Underwriter of Lloyds Syndicate MMX subscribing

to Reinsurance Policy Number WB1600126 issued to RHIC under Policy Number PAR 2106B1.

RHIC has a principal place of business at 76 St. Paul Street, #500, Burlington, Vermont.  The

Registered Agent for RHIC is AON Insurance Managers, Inc., 76 St. Paul Street, #500,

Burlington, Vermont 05401 with service of process through the West Virginia Secretary of State,

State Capitol Building, Charleston, West Virginia 25305.

      44.     Defendant Unknown is Lead Underwriter of Lloyds Syndicate MSP subscribing

to Reinsurance Policy Number WB1600219 issued to RHIC under Policy Number PAR 2106B1.

RHIC has a principal place of business at 76 St. Paul Street, #500, Burlington, Vermont.  The

Registered Agent for RHIC is AON Insurance Managers, Inc., 76 St. Paul Street, #500,

Burlington, Vermont 05401 with service of process through the West Virginia Secretary of State,

State Capitol Building, Charleston, West Virginia 25305.

45.     Defendant Unknown is Lead Underwriter of Lloyds Syndicate QBE subscribing to Reinsurance Policy Number WB1600199 issued to RHIC under Policy Number PAR 2106B1. RHIC has a principal place of business at 76 St. Paul Street, #500, Burlington, Vermont.  The Registered Agent for RHIC is AON Insurance Managers, Inc., 76 St. Paul Street, #500, Burlington, Vermont 05401 with service of process through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

46.     Defendant Unknown is Lead Underwriter of Lloyds Syndicate RNR subscribing to Reinsurance Policy Number WB1600099 issued to RHIC under Policy Number PAR 2106B1. RHIC has a principal place of business at 76 St. Paul Street, #500, Burlington, Vermont.  The Registered Agent for RHIC is AON Insurance Managers, Inc., 76 St. Paul Street, #500, Burlington, Vermont 05401 with service of process through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

47.     Defendant Unknown is Lead Underwriter of Lloyds Syndicate TMK subscribing to Reinsurance Policy Number WB1600099 issued to RHIC under Policy Number PAR 2106B1. RHIC has a principal place of business at 76 St. Paul Street, #500, Burlington, Vermont.  The Registered Agent for RHIC is AON Insurance Managers, Inc., 76 St. Paul Street, #500, Burlington, Vermont 05401 with service of process through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

48.     Defendant George Attipoe is Lead Underwriter for Lloyd's Underwriter Syndicate 5151 ENH for Endurance Worldwide Insurance Limited, established under the law of the United Kingdom, London, England, and bound a portion of Policy number WB 1600085 with Resort Hotel Association, Inc. ("RHA"). RHA has a principal place of business 2100 East Cary Street,

Suite 3, Richmond, Virginia 23223. The Registered Agent for RHA is Gail Waddell, 2100 East
Cary Street, Ste. 3, Richmond, Virginia 23223 with service of process through the West Virginia
Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

49.     Defendant Jamie Martin is Lead Underwriter of Lloyd's Underwriter Syndicate
No. 4444 CNP, London, England for Canopius Syndicate 4444/958 (D&F Property), established
under the law of the United Kingdom, London, England, and bound a portion of Policy number
WB 1600085 with Resort Hotel Association, Inc. ("RHA"). RHA has a principal place of
business 2100 East Cary Street, Suite 3, Richmond, Virginia 23223. The Registered Agent for
RHA is Gail Waddell, 2100 East Cary Street, Ste. 3, Richmond, Virginia 23223 with service of
process through the West Virginia Secretary of State, State Capitol Building, Charleston, West
Virginia 25305.

50.     Defendant Tom Ayton is Lead Underwriter of Lloyd's Underwriter Syndicate No.
3000 MKL, London, England for Markel International Limited, established under the law of the
United Kingdom and bound a portion of Policy number WB 1600085 with RHA. RHA has a
principal place of business 2100 East Cary Street, Suite 3, Richmond, Virginia 23223. The
Registered Agent for RHA is Gail Waddell, 2100 East Cary Street, Ste. 3, Richmond, Virginia
23223 with service of process through the West Virginia Secretary of State, State Capitol
Building, Charleston, West Virginia 25305.

51.     Defendant Simon Duke is Lead Underwriter of Lloyd's Underwriter Syndicate
No. 1886, London, England for QBE Property, established under the law of the United Kingdom
and bound a portion of Policy number WB 1600085 with RHA. RHA has a principal place of
business 2100 East Cary Street, Suite 3, Richmond, Virginia 23223. The Registered Agent for

14

RHA is Gail Waddell, 2100 East Cary Street, Ste. 3, Richmond, Virginia 23223 with service of process through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

52.     Defendant Samantha Shaw is Lead Underwriter of Lloyd's Syndicate No. 1206, ATL, established under the law of the United Kingdom and bound a portion of Policy number WB 1600085 with RHA. RHA has a principal place of business 2100 East Cary Street, Suite 3, Richmond, Virginia 23223.  The Registered Agent for RHA is Gail Waddell, 2100 East Cary Street, Ste. 3, Richmond, Virginia 23223 with service of process through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

53.     Defendant Stephen Carr is Lead Underwriter of ACT7 9536 B0823M71600001 N. A. Property, London, England for Aon Underwriting Managers, established under the law of the United Kingdom and bound a portion of Policy number WB1600085 and Policy number WB1600194 with RHA. RHA has a principal place of business 2100 East Cary Street, Suite 3, Richmond, Virginia 23223.  The Registered Agent for RHA is Gail Waddell, 2100 East Cary Street, Ste. 3, Richmond, Virginia 23223 with service of process through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

54.     Defendant Jennifer Style is Lead Underwriter of Lloyd's Underwriter Syndicate No. 2987 BRIT, London, England for Brit Global Specialty, established under the law of the United Kingdom and bound a portion of Policy number WB 1600085 with RHA. RHA has a principal place of business 2100 East Cary Street, Suite 3, Richmond, Virginia 23223.  The Registered Agent for RHA is Gail Waddell, 2100 East Cary Street, Ste. 3, Richmond, Virginia

23223 with service of process through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

56. Defendant Matthew Narbett is Lead Underwriter of Lloyds Syndicate 2003 XLC for Catlin Syn 2003/Caitlin Insurance Co (UK) established under the law of the United Kingdom and bound a portion of Policy number WB16000194 with RHA. RHA has a principal place of business 2100 East Cary Street, Suite 3, Richmond, Virginia 23223. The Registered Agent for RHA is Gail Waddell, 2100 East Cary Street, Ste. 3, Richmond, Virginia 23223 with service of process through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

56. Defendant Mark Ladbrook is Lead Underwriter of Lloyds Underwriter Syndicate Bi, 1183 TAL, London, England established under the law of the United Kingdom and bound a portion of Policy number WB1600085 with RHA. RHA has a principal place of business 2100 East Cary Street, Suite 3, Richmond, Virginia 23223. The Registered Agent for RHA is Gail Waddell, 2100 East Cary Street, Ste. 3, Richmond, Virginia 23223 with service of process through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

57. Defendant Mapfre is an insurance company organized and existing under the laws of the State of California. Its principal office is located at 100 Campus Drive, Florham Park, New Jersey 07932 and its West Virginia registered agent for service of process is Daniel P. Olohan, 211 Main Street, Webster, Massachusetts 01570 through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

58.     Defendant Novae Bermuda Underwriting Ltd. is an insurance company organized and existing under the law of Bermuda.  Its principal office is located at Canon's Court, 22 Victoria Street, Hamilton, HM 12, Bermuda and service is made through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

59.     Defendant Oil Casualty Insurance Ltd (OCIL) is an insurance company organized and existing under the law of Bermuda.  Its principal office is located at 3 Bermudiana Road, Hamilton, HM 08, Bermuda and service is made through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

60.     Defendant QBE Insurance Corporation is an insurance company organized and existing under the laws of the Commonwealth of Pennsylvania.  Its principal office is 600 N. 2nd Street, Ste. 401, Harrisburg, Pennsylvania and its West Virginia registered agent for service of process is any Officer, QBE Insurance, 600 N. 2nd Street, Ste. 401, Harrisburg, Pennsylvania through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

61.     Defendant RSUI Indemnity Company is an insurance company organized and existing under the laws of the State of New Hampshire.  Its principal office and its registered agent for service of process are c/o Nixon Peabody LLP, 889 Elm Street, Manchester, New Hampshire 03101 through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

62.     Defendant Sompo Japan Insurance Co. Of America is an insurance company organized and existing under the laws of the State of New York.  Its principal office is located at 777 Third Avenue, 24th Floor, New York, New York 10017 and its West Virginia registered

17

agent for service of process is John Calotta, 11405 North Community House Road, Charlotte, North Carolina 28277 through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

63.     Defendant Starr Surplus Lines Insurance Co. is an insurance company organized and existing under the laws of the State of Illinois.  Its principal office is located at 399 Park Avenue, New York, New York 10022 and its West Virginia registered agent for service of process is CT Corporation System, 1627 Quarrier Street, Charleston, West Virginia 25311 through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

64.     Defendant Swiss Reinsurance America Corporation is an insurance company organized and existing under the laws of the State of New York.  Its principal office is located at 175 King Street, Armonk, New York 10504 and its West Virginia registered agent for service of process is Lawrence Licitra, Senior Legal Counsel, Swiss Reinsurance America Corporation, 175 King Street, Armonk, New York 10504 through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

65.     Defendant Tokio Marine America Insurance Company is an insurance company organized and existing under the laws of the State of New York.  Its principal office is located at 1221 Avenue of the Americas, Suite 1500, New York, New York 10020 and its registered agent for service of process is Edward Sayogo, TMNA Services, LLC, 1221 Avenue of the Americas, Suite 1500, New York, New York 10020 through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

66.     Defendant XL Catlin Insurance Company is a corporation organized and existing under the law of Bermuda.  XL Catlin Insurance Company's principal office is O'Hara House, One Bermudiana Road, Hamilton, HM 11, Bermuda and service is made through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

67.     Defendant XL Insurance (Bermuda) Ltd is a corporation organized and existing under the law of Bermuda.  XL Insurance (Bermuda) Ltd.'s principal office is located at XL House, One Bermudiana Road, Hamilton, HM 11, Bermuda and service is made through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

68.     Defendant Resort Hotel Association, Inc. ("RHA") is a for-profit corporation, organized and existing under the laws of the State of Vermont.  RHA's principal office is located at 2100 East Cary Street, Suite 3, Richmond, Virginia 23223.  The Registered Agent for RHA is Gail Waddell, 2100 East Cary Street, Ste. 3, Richmond, Virginia 23223 with service of process through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

69.     Defendant Resort Hotel Insurance Services, Inc. ("RHIS") is a for-profit corporation, organized and existing under the laws of the Commonwealth of Virginia.  RHIS' principal office is located at 2100 East Cary Street, Suite 3, Richmond, Virginia 23223.  The Registered Agent for RHIS is Gail Waddell, 2100 East Cary Street, Ste. 3, Richmond, Virginia 23223 with service of process through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia 25305.

70.     Defendant Resort Hotel Insurance Company ("RHIC") is a for-profit corporation, organized and existing under the laws of the State of Vermont.  RHIC has a principal place of

business at 76 St. Paul Street, #500, Burlington, Vermont.  The Registered Agent for RHIC is

AON Insurance Managers, Inc., 76 St. Paul Street, #500, Burlington, Vermont 05401 with

service of process through the West Virginia Secretary of State, State Capitol Building,

Charleston, West Virginia 25305.

71.     Defendant Bankers Insurance, LLC ("Bankers") is an insurance company

organized under the laws of the State of Florida.  Bankers' principal office is located at 11101

Roosevelt Blvd. N, St. Petersburg, Florida, 33733-5707 and its West Virginia registered agent

for service of process is Corporation Service Company, 209 West Washington Street,

Charleston, West Virginia 25302 through the West Virginia Secretary of State, State Capitol

Building, Charleston, West Virginia 25305.

72.     Defendant VeriClaim, Inc. ("Vericlaim") is a corporation organized under the

laws of the State of Delaware.  Vericlaim's principal office is located at 1100 Ridgeway Loop

Road, Memphis, Tennessee 38120 and its West Virginia registered agent for service of process is

Corporation Service Company, 209 West Washington Street, Charleston, West Virginia 25302

through the West Virginia Secretary of State, State Capitol Building, Charleston, West Virginia

25305.

73.     RHA is the named insured on numerous policies of insurance that cover

properties owned by one, more or all Plaintiffs in White Sulphur Springs, Greenbrier County,

West Virginia (the "Policies").  By way of policy endorsements, Plaintiffs, with the exception of

Greenbrier Medical, are also named insureds under the Policies.  Greenbrier Medical owns

property on the Hotel grounds that is insured under the Policies.

74.     With the exception of RHA, RHIS, Bankers and Vericlaim, each of the remaining Defendants ("Defendant Insurers") is an insurer on one or more of the Policies.

75.     RHA and RHIS were agents of Plaintiffs at all times relevant hereto, through whom the Policies were selected and obtained for Plaintiffs.  The Policies covered real and personal property located in West Virginia.  The damages that resulted in the claims at issue were suffered by Plaintiffs in West Virginia, and the claims that were submitted by Plaintiffs to RHA and RHIS were formulated and approved in West Virginia.  Upon receipt of the claims, RHA and RHIS determined which of the subject Policies provided the requisite coverage and to which insurers those claims should be submitted.

76.     At all relevant times, each of the Defendants named herein transacted business in West Virginia, contracted to supply good or services in West Virginia and/or contracted to insure persons and property located in West Virginia.

77.     Upon information and belief, RHIC – a Defendant Insurer – is also affiliated with RHA and RHIS, although their exact relationship is unknown to Plaintiffs.

78.     Bankers was also an agent of Plaintiffs at all times relevant hereto, through whom the Policies were selected and obtained for Plaintiffs.

79.     Vericlaim is the designated loss adjuster under the Policies.

80.     Each Plaintiff is an entity affiliated with a destination resort, and as described in detail below each has incurred and continues to incur losses through business interruption, extra expenses, expenses to reduce loss, soft costs and loss of rental value/ income, as those terms are believed to be, and ought to be, defined and covered under the Policies.  These damages occurred in West Virginia and arose from acts and omissions in West Virginia.

21

81.     Certain of the Policies were issued by non-American companies and include international arbitration provisions.  The other policies are devoid of such provisions.

**B.      Jurisdiction And Venue**

82.     This Court has jurisdiction over this action pursuant to 9 U.S.C. § 201, *et seq.* Specifically, the Policies issued by four Defendant Insurers, which Policies include significant policy limits, also include international arbitration provisions that arise under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (also known as the New York Convention) and adopted by Congress at 9 U.S.C. §§ 201, *et seq.*, which Convention provides for federal question jurisdiction.

83.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 2201, *et seq.*, in that it seeks a declaratory judgment.

84.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over the state law claims.  Jurisdiction is also proper in this Court pursuant to the West Virginia Long-Arm Statute, W. Va. Code § 56-3-33, in that at all relevant times each Defendant transacted business in West Virginia, contracted to supply goods or services in West Virginia and/or contracted to insure persons and property located in West Virginia.

85.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in West Virginia, as detailed in Paragraphs 75, 76, and 80, *supra*, and in that at all relevant times each Defendant transacted business in West Virginia, contracted to supply goods or services in West Virginia and/or contracted to insure persons and property located in West Virginia.  Venue is

proper in this Court pursuant to 9 U.S.C. § 204, which provides that an action may be brought in any District Court in which, save for an arbitration agreement, the action could have been brought. In addition, Plaintiffs forwarded premiums for the Policies at issue to RHA from West Virginia.

## II.    FACTUAL BACKGROUND

### A.    Plaintiffs' Properties.

86.    Plaintiffs, individually or jointly, own certain properties located in White Sulphur Springs, Greenbrier County, West Virginia. Specifically, they own the Greenbrier Hotel and Resort (the "Hotel") and the Greenbrier Sporting Club (the "Club").

87.    The Hotel property includes three championship-level courses – the Old White Course, the Meadows Course and the Greenbrier Course – as well as the historic Old Hickory Shafted Oakhurst 9-hole course (the "Old Oakhurst Course"). The Old White Course has been the host of the Greenbrier Classic (the "Tournament"), a PGA Tour event, since 2010.

88.    The Club property includes a fourth championship-level course – the Sam Snead Course. At the time of the flood described below, Greenbrier Club was in the process of constructing a sixth course – the New Oakhurst Course. The New Oakhurst Course is to be a mountain course located adjacent to the oldest known country club in America and was designed by four golfing legends – Arnold Palmer, Jack Nicklaus, Gary Player and Lee Trevino. This was the only time all four golfing legends had come together to design and develop a golf course.

89.    Along with the New Oakhurst Course, Greenbrier Club and Oakhurst had developed plans for hundreds of luxury home sites both at the Club location and at the Oakhurst location. Oakhurst also had plans for a ski resort (the New Oakhurst Course, the luxury home

development at Oakhurst and the ski resort referred to collectively as the "Oakhurst Development") to attract guests to the Hotel and the Club in the winter months. The ski resort was planned to be open only to those staying at the Hotel and to members of the Club.

90.     In 2015, Oakhurst and Greenbrier Club initiated an intense marketing campaign to sell lots at the Club and at the Oakhurst Development. In order to obtain a lot at either site, each purchaser is or was required to pay a one-time initiation fee of $140,000 and is or was responsible for annual dues in the approximate amount of $18,000. These lots, even in light of the related fees, were desirable in large part because of the presence of the Sam Snead Course at the Club property, the planned Oakhurst Course and the planned ski resort.

91.     As a special incentive, Oakhurst and Greenbrier Club offered the first forty (40) purchasers of lots a waiver of the initiation fee and a lifetime waiver of the annual dues.

92.     The ski resort was scheduled to open in December 2016, and the Club was also actively securing $500,000 founding memberships for the Oakhurst Development. The purchase of lots at the Club and at the Oakhurst Development, the construction of homes on those lots, the ski resort development and the efforts to secure founding memberships all effectively ceased after the flood.

**B.     The Thousand-Year Flood.**

93.     On June 23, 2016, a thousand-year flood event (the "Flood") devastated the Greenbrier Valley in White Sulphur Springs, West Virginia. Approximately eleven inches of rain fell in the area within a twelve-hour period.

94.     Twenty-three fatalities resulted from the Flood, making it one of the deadliest floods in West Virginia history.  Flooding in the town of White Sulphur Springs, where the Hotel, the Club and the Oakhurst Development are located, was especially catastrophic.

95.     The disaster recovery efforts following the flooding were significant and lasted for several months.  Some of the hardest-hit areas were low-lying areas in White Sulphur Springs where many of Plaintiffs' employees live.  Homes were swept away, and people were displaced.

96.     Plaintiffs employ over 1,600 people who live in and around the devastated communities, and their immediate focus after the Flood was on the well-being of the community. The Hotel opened immediately following the Flood in order to house displaced members of the community free-of-charge.  Plaintiffs' primary goal at that time was to get the properties re-opened so that Plaintiffs' employees could get to their jobs and their paychecks.  In addition to expending time and energy getting the properties re-opened, Greenbrier Hotel and members of the Greenbrier Club raised millions of dollars to help the community recover.  Plaintiffs are proud of the role they played in the inspiring story of the aftermath of the Flood.

**C.      The Damage To The Hotel.**

97.     The Hotel is 240 years old and is an historic landmark.  Located in the Allegheny Mountains of West Virginia, it is a destination resort.

98.     The Hotel and surrounding buildings were severely damaged by the excessive rainfall and resulting Flood.  By way of representative examples, but by no means limitation:

       a.      The casino at the Hotel was partially flooded.

b.  Colonial Hall, which houses a ballroom and conference center, sustained significant roof and structural damage.  There is also now a concern that mold has or may appear.

c.  The brand-new chapel was flooded by six feet of water.

d.  The tennis stadium was flooded by twenty-five feet of water.

e.  The golf academy was completely destroyed.

f.  The golf equipment buildings were devastated.

g.  Roof breaks in the hotel caused water and other damage to guest rooms, hallways and furniture.

99.  In addition to the physical damage, the Hotel also suffered economic damage from the loss of hotel guest stay revenue, revenue from the operation of the Greenbrier, Meadows, Old Oakhurst and Old White Courses, revenue associated with the cancellation of the Tournament in 2016 and, as described below, the resulting punitive decision by the PGA to move the Tournament to the early fall starting in 2019 and thereafter.  This action, prompted by the cancellation of the 2016 Tournament which was necessitated by the Flood, made the Tournament, including related Hotel stays, much less lucrative for Plaintiffs, and in particular for Greenbrier Hotel.

**D.  The Damage To The Club And The Oakhurst Development.**

**1.  The Club.**

100.  The Sam Snead Course located on the Club property was partially destroyed by the Flood and remained closed because of the damage for one year.  To date, Greenbrier Club has spent over $5 million in rebuilding the Sam Snead Course.

101.    The loss of the Sam Snead Course has of course also resulted in lost revenues and has had a detrimental effect on the efforts of the Greenbrier Club and Oakhurst to sell the residential lots and to acquire the related initiation fees and annual dues, all as described above.

### 2.    The Oakhurst Development.

102.    The ability to market and sell lots at the Oakhurst Development has likewise been nearly eradicated because of the Flood.  The construction of the New Oakhurst Course and the ski facility, and the existence of the Sam Snead Course, were key selling points for lots at the Oakhurst Development.  Those selling points have now been destroyed, or severely damaged, because of Defendant Insurers' bad faith failure and refusal to pay Plaintiffs' claims related to those Courses and the ski resort.

103.    Plaintiffs' damages are ongoing and will continue well beyond the point in time that the New Oakhurst Course is constructed and opened, and the ski resort is constructed and opened.  Even after these events take place, Plaintiffs – and in particular Greenbrier Club and Oakhurst – will most likely continue to experience difficulties in selling lots.

### E.    The Damage To The Golf Courses.

### 1.    The Meadows, Greenbrier, Sam Snead, Old Oakhurst and New Oakhurst Courses.

104.    The Sam Snead Course and the Meadows Course sustained heavy damage as a result of the Flood.  The remediation and restoration costs were in the millions of dollars.  The Greenbrier Course, which sustained the least amount of damage, was able to be opened in April 2017, with a limited number of playable holes.  Work on the Sam Snead Course was completed, and the course opened in May of 2017, and the Meadows Course, which was completely destroyed and rebuilt was reopened in September 2017.  The Old Oakhurst Course was

substantially damaged and has yet to be reopened.  The losses sustained because of the extensive amounts of time these courses were closed were significant.

105.    As described above, development of the New Oakhurst Course, which was commenced prior to the Flood, has now completely ceased, and Plaintiffs continue to suffer damage and losses as a result of that course remaining incomplete.

## 2.    **The Old White Course.**

106.    The Old White Course also suffered significant damage as a result of the Flood. The damage was so severe that the Tournament, which is held at the Old White Course, scheduled to take place over the 2016 Fourth of July holiday, had to be cancelled.

107.    The Flood resulted in major media coverage, due to the Tournament being cancelled and also because of phone video of the damage to the Hotel, the Club and the Oakhurst Development captured by professional golfer Bubba Watson, who owns property at the Oakhurst Development.

108.    Greenbrier Hotel spends millions of dollars every year to host the Tournament. The first two days of the Tournament are televised on the Golf Channel and the weekend rounds are televised nationally on CBS.  The exposure received by the Hotel from the Tournament is very significant, and the Tournament is the marquee event for the Hotel from a marketing perspective.

109.    Prior to the Tournament scheduled for July 2016, Greenbrier Hotel had paid the required title sponsorship fee to PGA of America in the amount of nearly $10 million. Greenbrier Hotel had also secured $5+ million in sponsorship fees from supporting individuals and businesses for the 2016 Tournament.

28

110.    Following the Flood and the cancellation of the 2016 Tournament, there was significant uncertainty regarding whether the Old White Course could be repaired and ready for the 2017 Tournament.  Because of this uncertainty, Greenbrier Hotel was concerned about maintaining its sponsorship base and about its ability to secure revenue for the 2017 and future Tournaments.

111.    As a show of good faith and good will, and as a result of these concerns, Greenbrier Hotel allowed the 2016 sponsors who had already paid their sponsorship fees for the 2016 Tournament to "roll over" those fees to the 2017 Tournament.

112.    In March and June of 2016, Greenbrier Hotel had paid to the PGA of America the required $9.7 million title sponsorship fee for the 2016 Tournament.  Because the Tournament was cancelled, the PGA eventually refunded $3.6 million of this amount, but the remainder – $6.1 million – was not refunded and was not paid to Greenbrier Hotel by Defendant Insurers.

113.    Another consequence of the Flood, referenced briefly above, was the change in the date of the Tournament.  In 2012, Greenbrier Hotel executed an agreement with PGA of America pursuant to which Greenbrier Hotel would host the Tournament every year through 2021, with annual title sponsorship fees paid by Greenbrier Hotel that increased by 5% each year.  Because of the Flood and the failure of Defendant Insurers to meet their obligations under the Policies, Greenbrier Hotel did not have sufficient funds to pay the $10.4 million title sponsorship fee for the 2017 Tournament.  Greenbrier Hotel brought this situation to the attention of PGA America, and PGA America agreed that the $10.4 million fee for the 2017 Tournament could be paid in four equal installments, in 2018, 2019, 2020, and 2021, along with the title sponsorship fees for each of those years.  In exchange, however, PGA America required

Greenbrier Hotel to give up its summer Tournament date and move the Tournament to September. The Tournament will be held in the fall in 2019 and thereafter through 2026.

114. Moving the Tournament to the fall will result in competition for viewership and attendance with collegiate and professional football games played on the same weekend as the Tournament. The Tournament will also lose CBS and all the media coverage from CBS because of the fall date.

115. The financial impact of losing the Fourth of July Tournament dates will be felt by Plaintiffs for years to come and has resulted in damages for lost profits in excess of tens of millions of dollars.

**F.** **The Policies Procured By RHA, RHIS And Bankers.**

116. Plaintiffs directed RHA and RHIS to procure property insurance for Plaintiffs' properties that would provide sufficient coverage.

117. RHA and RHIS knew and understood that Plaintiffs are involved in the hospitality, recreation, golf and property development industries. RHA and RHIS knew or should have known that Plaintiffs' properties included historical landmarks. RHA and RHIS knew or should have known that Plaintiffs' properties provided the significant majority, if not all, of Plaintiffs' income, that Plaintiffs are internationally known for the quality of their golf courses, and that those golf courses are an important part of Plaintiffs' reputations and incomes.

118. RHA and RHIS knew or should have known that Plaintiffs would not purchase Policies that limited total recoveries for all Courses to $10 million (as described below). RHA and RHIS knew or should have known that Plaintiffs would not purchase Policies that required them to arbitrate any coverage issues in international forums, that required the use of English

Barristers, and that required the application of English law. RHA and RHIS committed errors and omissions in obtaining Policies that contravened these interests of Plaintiffs and grossly negligently failed to adequately disclose to Plaintiffs the existence of the offending provisions.

119.    After the Flood occurred, and as part of the process of formulating their claims, Plaintiffs made repeated requests to RHA and RHIS to provide them with copies of the Policies – critical documents never provided to Plaintiffs when the existing insurance coverage was obtained by RHA and RHIS. It took over twelve months, and the institution of a lawsuit by certain of Plaintiffs, to finally obtain copies of the Policies that were paid for by Plaintiffs and that purported to cover Plaintiffs' claims. Plaintiffs believe that one reason RHA and RHIS failed to provide them with the Policies was that they knew Plaintiffs were unaware of the golf course coverage limitations and the international arbitration provisions in certain of the Policies and that Plaintiffs would be outraged when they learned of those provisions.

120.    Bankers likewise knew and understood that Plaintiffs are involved in the hospitality, recreation, golf and property development industries. Bankers knew or should have known that Plaintiffs' properties included historical landmarks. Bankers knew or should have known that Plaintiffs' properties provided the significant majority, if not all, of Plaintiffs' income, that Plaintiffs are internationally known for the quality of their golf courses, and that those golf courses are an important part of Plaintiffs' reputations and incomes.

121.    Bankers knew or should have known that Plaintiffs would not purchase Policies that limited total recoveries for all Courses to $10 million (as described below). Bankers knew or should have known that Plaintiffs would not purchase Policies that required them to arbitrate any coverage issues in international forums, that required the use of English Barristers, and that

required the application of English law, but likewise committed errors and omissions in obtaining Policies that contravened these interests of Plaintiffs and grossly negligently failed to adequately disclose to Plaintiffs the existence of the offending provisions.

**G.      Plaintiffs Assert Claims Under The Policies And Defendant Insurers Wrongfully Refuse The Majority Of The Claims.**

122.    Plaintiffs timely notified RHA, RHIS and Bankers of their claims for losses and coverage related to the extensive damage sustained as a result of the Flood and understood and reasonably believed that RHA, RHIS and Bankers would take all steps necessary to present those claims to the insurers, including the Defendant Insurers.

123.    Upon information and belief, RHA, RHIS and Bankers submitted Plaintiffs' claims to nine insurers, but Plaintiffs are without knowledge as to whether the claims were indeed submitted to only nine insurers and, if so, which nine insurers RHA, RHIS and Bankers chose, why they chose those insurers, the extent of coverage available under each said policy, and which, if any, of the nine insurers has made payments under their respective policies.

124.    Upon information and belief, certain of the insurers recognized the extent of the damage and that their policies were fully exposed.  These insurers paid their respective policy limits and exited the claims process.  Again, however, Plaintiffs have no direct knowledge as to whether this is true and which insurers have "paid out."

125.    Plaintiffs estimate their "basic" claim – for property damage alone – to be in excess of $50 million, with other basic claims totaling in excess of $55 million for business interruption, extra expenses, expenses to reduce loss, soft costs and loss of rental value/rental income.  Plaintiffs believe they have suffered and will continue to suffer tens of millions of dollars in damages resulting from lost sales at the Oakhurst Development, including lot sales, ski

32

memberships and golf memberships, losses related to the loss of the summer PGA Tournament slot and numerous marketing costs and losses which have yet to be quantified.

126.    Vericlaim was named as an adjuster under the Policies and was retained by Goodman-Gable-Gould ("GGG"), the entity Plaintiffs initially hired to consult as to the claims and to assist in formulating the claims.  GGG was subsequently replaced by BDO, but Vericlaim has been the adjuster for Defendant Insurers at all relevant times hereto.

127.    To date, approximately $37 million of Plaintiffs' claims have been paid. Vericlaim has wrongfully and in violation of its duties to Plaintiffs, informed the Defendant Insurers that Plaintiffs' financial losses total only $37 million, causing damage to Plaintiffs and to Governor Justice.  Plaintiffs assert that Plaintiffs are still owed in excess of $75 million from Defendant Insurers.

128.    In addition to the expectations Plaintiffs had of RHA, RHIS and Bankers, Plaintiffs also had the reasonable expectation that Plaintiffs' flood damages would be covered by the Policies and that Defendant Insurers would negotiate those claims in good faith.  Plaintiffs made a reasonable demand during the course of their negotiations with Defendant Insurers that was within policy limits.  Defendant Insurers did not reasonably, fairly or promptly respond.

129.    Instead, the negotiations as a whole from the time of the Flood to the last payment of proceeds have been inadequate, conducted in bad faith and conducted in violation of Defendant Insurers' statutory and common law duties of good faith and fair dealing implied in the Policies and according to applicable West Virginia and other law.

130.    By way of example, but not limitation, Defendant Insurers, acting on the information and opinions provided by Vericlaim:

     a.     have refused to cover the $6.1 million title sponsorship fee that Greenbrier Hotel lost for the 2016 Tournament yet have taken a credit against Plaintiffs' recoveries for the $3.6 million that PGA America refunded to Greenbrier Hotel;

     b.     have refused to cover the $5+ million sponsorship fees that Greenbrier Hotel received for the 2016 Tournament but rolled over to the 2017 Tournament, citing an "Act of God" clause in many of the sponsorship contracts that arguably would have precluded the sponsors from recovering their 2016 fees; and

     c.     have refused to cover the $10.4 million title sponsorship fee due from Greenbrier Hotel to PGA America for the 2017 Tournament despite the fact that Greenbrier Hotel's inability to pay that fee arose directly from Defendant Insurers' bad faith failure to timely pay Plaintiffs' claims as presented and in full.

In addition, Defendant Insurers, acting on the information and opinions provided by Vericlaim, have disallowed recovery of many other aspects of Plaintiffs' damages incurred as a result of the cancellation of the 2016 Tournament and the loss of the July Tournament dates for 2019 through 2026.

     131.    As described above, the physical damage to the golf courses was extensive and it took more than one year to repair the Old White Course.  Following the Flood, Plaintiffs undertook one of the largest, if not the largest, golf remediation/construction projects in the world to date in order to return the courses to championship level, worthy of hosting PGA tour

events and to maintain the consistency at the holes. Plaintiffs were also intent on preserving the historic landmark status of the Hotel and its properties. Defendant Insurers, acting on the information and opinions provided by Vericlaim, have taken the unreasonable and bad faith position that the work performed was above and beyond that allowed by the Policies, despite the fact that the Policies included provisions related to maintaining the Hotel's historic landmark status.

132.    Certain of the Policies have occurrence sub-limits of $10 million for golf course repairs, regardless of the number of courses or policyholders impacted by the occurrence. Defendant Insurers, acting on the information and unsupportable opinions provided by Vericlaim, have inexcusably and in bad faith failed to even tender the $10 million limit for the repairs to the four championship-level courses, not to mention the financial damage caused by Plaintiffs' inability to continue the development of the New Oakhurst Course.

133.    Because of Defendant Insurers' intransigent, bad faith, unreasonable refusal to honor their contractual obligations, Plaintiffs – and in particular Greenbrier Hotel – have been brought to near financial insolvency and have been unable to fulfill certain of their financial obligations.

134.    Defendant Insurers, acting on the information and unsupportable opinions provided by Vericlaim, have also denied any coverage for the residential and ski resort portions of the Oakhurst Development, despite the fact that significant construction was underway when the Flood occurred.

135.    Plaintiffs initially retained GGG to consult with Plaintiffs and formulate their claims, and subsequently retained BDO, an expert in claims determination, to review and assist

in formulating and submitting the claims.  BDO provided the amounts of the losses, but Defendant Insurers wrongfully and negligently disregarded the values that BDO formulated.

136.    RHA, as the insured under the Policies, and Vericlaim, as the designated loss adjuster, are liable to Plaintiffs because of their bad faith failure and refusal to insist and ensure that Defendant Insurers adhere to the provisions of the Policies with respect to Plaintiffs' claims and to act fairly, honestly and in good faith.

137.    RHA, RHIS and Bankers, as the agents who procured the Policies for Plaintiffs at the request of Plaintiffs, are also liable to Plaintiffs because of their errors, omissions and bad faith failures to procure adequate coverage, coverage that does not unreasonably limit coverage available for the golf courses, and coverage that does not require international arbitration in order to recover in the event of disputes.

## COUNT I

### (Declaratory Judgment – Against Defendant Insurers)

138.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 137 of this Complaint as if fully set forth herein.

139.    Plaintiffs have made claims under the Policies in excess of $100 million to compensate them for the damages and losses sustained as a result of the Flood.  Because of the amount of time that has passed and the continuing nature of Plaintiffs' damages and losses, Plaintiffs estimate the claims now exceed $107 million, with only approximately $37 million of that amount having been paid.  This estimated amount does not include claims related to the loss of sales at the Oakhurst Development, the loss of the summer date for the PGA Tournament and related marketing costs and additional losses.

36

140.    Defendant Insurers have wrongfully failed and refused to pay Plaintiffs' claims in full and as presented.

141.    Defendant Insurers have claimed that certain of Plaintiffs' damages and losses are not covered by the Policies.

142.    Plaintiffs, by contrast, assert that Plaintiffs' losses and damages, as set forth in their claims, are covered in their entirety under the Policies.

143.    A real and justiciable controversy therefore exists as to the extent and amount of coverage the Policies provide for Plaintiffs' damages and losses.

144.    Plaintiffs are therefore entitled to a Declaratory Judgment declaring that the Policies provide full coverage for Plaintiffs' claims.

145.    Plaintiffs further assert that Defendant Insurers' failure and refusal to pay Plaintiffs' claims in full and as presented, and their claims that certain of Plaintiffs' damages and losses are not covered by the Policies, have been undertaken and asserted in bad faith and in violation of the West Virginia Unfair Trade Practices Act (the "UTPA"), W. Va. Code §§ 33-11-4(9), *et seq.*, and Plaintiffs are therefore entitled to recover damages that include, but are not limited to, consequential damages, net economic losses, aggravation, inconvenience and their reasonable attorney fees in bringing this action.

146.    Plaintiffs also further assert that under the laws of the State of West Virginia, when an insured substantially prevails in a coverage dispute against his insurer, the insurer is liable for the insured's reasonable attorney fees, the expenses of litigation, and damages for aggravation and inconvenience.

147.    Accordingly, Plaintiffs seek a declaration of this Court that, in the event they substantially prevail in the instant coverage dispute, they are entitled to recover all damages available to them under the law as set forth in *Hayseeds, Inc. v State Farm Fire & Cas.*, 352 S.E.2d 73 (W. Va. 1986), *Miller v. Fluharty*, 500 S.E.2d 310 (W. Va. 1997), and their progeny, including but not limited to damages arising from the aggravation and inconvenience experienced by Plaintiffs and their principals, including James C. Justice, II, related to Defendant Insurers' failure and refusal to timely pay Plaintiffs' claims in full and as presented.

## COUNT II

### (Breach Of Contract – Against Defendant Insurers)

148.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 147 of this Complaint as if fully set forth herein.

149.    Each of the Policies entered into between one or more Defendant Insurers and one, more or all of Plaintiffs is a contract.

150.    Pursuant to the terms of each Policy, Defendant Insurers agreed to provide the coverage specified in the Policy in the event of a catastrophic loss such as the Flood that occurred in West Virginia in 2016 and that caused devastating damage to Plaintiffs.

151.    By failing to honor and pay Plaintiffs' claims in full and as presented, Defendant Insurers have materially breached the Policies.  As a direct and proximate cause of these breaches of the Policies, Plaintiffs have suffered damage in an amount believed to be in excess of $107 million total, of which amount approximately $37 million has been paid.

152.    Plaintiffs are therefore entitled to recover compensatory damages from Defendant Insurers, each in amounts proportional to the extent of their coverage vis-à-vis the $600 million

total coverage, arising from their breaches of the Policies, the exact amount of which is estimated

to be in excess of $75 million but which will be determined at trial in an amount in excess of the

minimum jurisdictional limits of this Court.

153.     In addition, under the laws of the State of West Virginia, when an insured

substantially prevails in a coverage dispute against his insurer, the insurer is liable for the

insured's reasonable attorney fees, the expenses of litigation, and damages for aggravation and

inconvenience.

154.     Accordingly, in the event that Plaintiffs substantially prevail in the instant

coverage dispute, they are entitled to recover all damages available to them under the law as set

forth in *Hayseeds, Inc. v. State Farm Fire & Cas.*, 352 S.E.2d 73 (W.Va. 1986), *Miller v.*

*Fluharty*, 500 S.E.2d 310 (W.Va. 1997), and their progeny, including but not limited to damages

arising from the aggravation and inconvenience experienced by Plaintiffs and their principals,

including James C. Justice, II, related to Defendant Insurers' failure and refusal to timely pay

Plaintiffs' claims in full and as presented.

## COUNT III

### (Breach Of Implied Covenant Of Good Faith, Honesty And Fair Dealing – Against Defendant Insurers)

155.     Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1

through 154 of this Complaint as if fully set forth herein.

156.     At all times relevant herein, and since at least March 2016, when the Policies

were entered into between Plaintiffs and Defendant Insurers, there was imposed upon each

Defendant Insurer an implied covenant of good faith, honesty and fair dealing in favor of

Plaintiffs, as the named insureds under the Policies.

157.     This implied covenant of good faith, honesty and fair dealing required that Defendant Insurers act in the best interest of Plaintiffs with respect to the claims they asserted under the Policies.

158.     Defendant Insurers breached this implied covenant of good faith, honesty and fair dealing by wrongfully and in bad faith refusing to pay Plaintiffs' claims under the Policies, in full and as presented.

159.     As a direct and proximate result of Defendant Insurers' breaches of the implied covenant of good faith, honesty and fair dealing, Plaintiffs have suffered and will continue to suffer financial losses and losses to their prospective business advantages, and Defendant Insurers have wrongfully benefitted.

160.     Plaintiffs are therefore entitled to recover compensatory damages from Defendant Insurers, each in an amount proportional to the extent of their coverage vis-à-vis the $600 million total coverage, arising from their breaches of the implied covenant of good faith, honesty and fair dealing, the exact amount of which is estimated to be in excess of $75 million but which will be determined at trial in an amount in excess of the minimum jurisdictional limits of this Court.

## COUNT IV

### (Violation Of West Virginia Unfair Trade Practices Act, W. Va. Code §§ 33-11-4(9), *et seq.* – Against Defendant Insurers)

161.     Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 160 of this Complaint as if fully set forth herein.

162.     When they entered into the Polices, Plaintiffs had the reasonable expectation that any flood damages they might sustain would be covered by the Policies.  Plaintiffs also had the

reasonable expectation that Defendant Insurers would act in good faith in settling any claims asserted by Plaintiffs, including Plaintiffs' claims related to the Flood.

163.    The negotiations as a whole from the time of the Flood to the last payment of proceeds made by Defendant Insurers were conducted in bad faith and Defendant Insurers wrongfully and unfairly denied or reduced a substantial portion of Plaintiffs' claims.  Plaintiffs made a reasonable demand during the course of negotiations, which demand was within the limits of the Policies, but Defendant Insurers in bad faith failed to reasonably and promptly respond.  This conduct on the part of Defendant Insurers was more than a single violation of the UTPA, and Defendant Insurers' violations of the UTPA arose from separate, discrete acts or omissions in the settlement of Plaintiffs' claims and represent the habit, custom or business policy of one, more or all Defendant Insurers.

164.    Defendant Insurers' failure to pay the claims in full and as presented, failure to use good faith in settling the claims, bad faith failure to reasonably and promptly respond to Plaintiffs' claims all constituted bad faith negotiation of an insurance settlement.  Defendant Insurers mishandled each and every aspect of the claims submitted by Plaintiffs from the outset and their bad faith in responding to and negotiating Plaintiffs' claims are representative of Defendant Insurers' general unfair business practices.

165.    Defendant Insurers' bad faith actions and omissions with respect to Plaintiffs' claims were all in violation of the UTPA.

166.    As a direct and proximate result of Defendant Insurers' violations of the UTPA, Plaintiffs have suffered damages and Defendant Insurers have benefitted.  Plaintiffs are therefore entitled to recover compensatory and consequential damages from Defendant Insurers, each in

amounts proportional to the extent of their coverage vis-à-vis the $600 million total coverage, arising from their violations of the UTPA, the exact amounts of which are estimated by Plaintiffs to be in excess of $75 million but which will be determined at trial in excess of the minimum jurisdictional limits of this Court.

167.    In addition, and because Defendant Insurers' denial of Plaintiffs' claims was carried out with actual malice toward Plaintiffs or with a conscious, reckless and outrageous indifference to the welfare of Plaintiffs, they are entitled to recover punitive damages from Defendant Insurers, each in an amount proportional to the extent of their coverage vis-à-vis the $600 million total coverage, the exact amount of which will be determined at trial in excess of the minimum jurisdictional limits of this Court.

## COUNT V

### (Common Law Bad Faith – Against Defendant Insurers)

168.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 167 of this Complaint as if fully set forth herein.

169.    When they entered into the Polices, Plaintiffs had the reasonable expectation that any flood damages they might sustain would be covered by the Policies.  Plaintiffs also had the reasonable expectation that Defendant Insurers would act in good faith in settling any claims asserted by Plaintiffs, including Plaintiffs' claims related to the Flood.

170.    The negotiations as a whole from the time of the Flood to the last payment of proceeds made by Defendant Insurers were conducted in bad faith and Defendant Insurers wrongfully and unfairly denied or reduced a substantial portion of Plaintiffs' claims.  Plaintiffs made a reasonable demand during the course of negotiations, which demand was within the

limits of the Policies, but Defendant Insurers in bad faith failed to not reasonably and promptly respond.

171.    Defendant Insurers' failure to pay the claims in full and as presented, failure to use good faith in settling the claims, bad faith failure to reasonably and promptly respond to Plaintiffs' claims all constituted bad faith negotiation of an insurance settlement.

172.    In addition, Defendant Insurers acted with actual malice toward Plaintiffs or with a conscious, reckless and outrageous indifference to the welfare of Plaintiffs in denying Plaintiffs' claims under the Policies.  In so doing, Defendant Insurers continued their general, wrongful business practice of handling claims under policies issued by them in bad faith.

173.    As a direct and proximate result of Defendant Insurers' bad faith negotiations and bad faith failure to pay Plaintiffs' claims in full and as presented, Plaintiffs have suffered damages and Defendant Insurers have benefitted.

174.    Plaintiffs are therefore entitled to recover compensatory damages and punitive damages from Defendant Insurers, in separate amounts, each in amounts proportional to the extent of their coverage vis-à-vis the $600 million total coverage, arising from their bad faith negotiations and bad faith failure to pay Plaintiffs' claims, the exact amounts of which are estimated by Plaintiffs to be in excess of $75 million (compensatory damages) and $300 million (punitive damages), and which will be determined at trial in excess of the minimum jurisdictional limits of this Court.

## COUNT VI

### (Interference With Existing And Prospective Business Advantages – Against Defendant Insurers)

175.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 174 of this Complaint as if fully set forth herein.

176.    When they issued the Policies, Defendant Insurers knew that Plaintiffs are involved in the hospitality, recreation, golf and property development industries.  When they issued the Policies, Defendant Insurers knew that Plaintiffs' businesses involve, and indeed depend upon, their entering into contractual and other business relationships with third parties.

177.    Defendant Insurers have interfered with and damaged Plaintiffs' ability to meet their existing business obligations to third parties and to enter into new business opportunities with third parties through their actions and omissions described herein, including but not limited to:

    a.    failing to cover the $6.1 million title sponsorship fee for the 2016 Tournament that was not reimbursed by PGA America;

    b.    taking a $3.6 million credit against Plaintiffs' recoveries for the portion of the 2016 title sponsorship fee refunded to Greenbrier Hotel;

    c.    refusing to cover the $5+ million sponsorship fees paid to Greenbrier Hotel for the 2016 Tournament that Greenbrier Hotel rolled over to the 2017 Tournament;

    d.    failing to pay in full and as presented Plaintiffs' claims for repairing the five existing golf courses;

44

     e.       failing to pay in full and as presented Plaintiffs' claims related to the

             Hotel, the Oakhurst Development – including the ski resort, the New

             Oakhurst course and the residential development; and

     f.        failing to pay in full and as presented Plaintiffs' claims for lost business.

178.    Defendant Insurers knew or should have known that Plaintiffs would and did reasonably believe that any and all damages caused by a natural disaster such as the Flood would be covered by the Policies, and that Plaintiffs relied upon this reasonable belief in conducting their respective businesses.

179.    By wrongfully and in bad faith failing to pay Plaintiffs' claims in full and as presented, Defendant Insurers have denied Plaintiffs the opportunity to fully profit from their respective businesses and have thereby interfered in the existing and prospective business advantages and opportunities of Plaintiffs.

180.    As a direct and proximate result of such wrongful interference in their existing and prospective business advantages and opportunities, Plaintiffs have suffered and will continue to suffer financial losses and damage.

181.    Plaintiffs are therefore entitled to recover compensatory damages from Defendant Insurers, in separate amounts, each in amounts proportional to the extent of their coverage vis-à-vis the $600 million total coverage, arising from their interference with Plaintiffs' existing and prospective business advantages and opportunities, the exact amounts of which are estimated to be in excess of $75 million but which will be determined at trial in an amount in excess of the minimum jurisdictional limits of this Court.

182.    In addition, Defendant Insurers undertook these actions with actual malice toward Plaintiffs or with a conscious, reckless and outrageous indifference to the health and welfare of Plaintiffs, and Plaintiffs are therefore entitled to recover punitive damages in an amount to be determined at trial in an amount in excess of the minimum jurisdictional limits of this Court.

## COUNT VII

### (Tortious Interference With Contractual Relations – Against Defendant Insurers)

183.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 182 of this Complaint as if fully set forth herein.

184.    When they issued the Policies, Defendant Insurers knew that Plaintiffs are involved in the hospitality, recreation, golf and property development industries.  When they issued the Policies, Defendant Insurers knew that Plaintiffs' businesses involve, and indeed depend upon, their entering into contractual and other business relationships with third parties.

185.    Defendant Insurers have interfered with and damaged Plaintiffs' ability to meet their existing contractual obligations to certain third parties through their actions and omissions described herein, including but not limited to:

     a.    failing to cover the $6.1 million title sponsorship fee for the 2016 Tournament that was not reimbursed by PGA America;

     b.    taking a $3.6 million credit against Plaintiffs' recoveries for the portion of the 2016 title sponsorship fee refunded to Greenbrier Hotel;

     c.    refusing to cover the $5+ million sponsorship fees paid to Greenbrier Hotel for the 2016 Tournament that Greenbrier Hotel rolled over to the 2017 Tournament;

       d.      failing to pay in full and as presented Plaintiffs' claims for repairing the five existing golf courses;

       e.      failing to pay in full and as presented Plaintiffs' claims related to the Hotel, the Oakhurst Development – including the ski resort, the New Oakhurst course and the residential development; and

       f.      failing to pay in full and as presented Plaintiffs' claims for lost business.

186.    Defendant Insurers knew or should have known that Plaintiffs would and did reasonably believe that any and all damages caused by a natural disaster such as the Flood would be covered by the Policies, and that Plaintiffs relied upon this reasonable belief in entering into business contracts with third parties.

187.    By wrongfully and in bad faith failing to pay Plaintiffs' claims in full and as presented, Defendant Insurers have caused Plaintiffs to breach certain of their respective contracts with third parties, have caused reputational and financial damage to Governor Justice and have thereby interfered in the contractual relations that Plaintiffs have with third parties.

188.    As a direct and proximate result of such wrongful interference in their contractual relations, Plaintiffs have suffered and will continue to suffer financial losses and damage.

189.    Plaintiffs are therefore entitled to recover compensatory damages from Defendant Insurers, in separate amounts, each in amounts proportional to the extent of their coverage vis-à-vis the $600 million total coverage, arising from their interference with Plaintiffs' contractual relations, the exact amounts of which are estimated to be in excess of $75 million but which will be determined at trial in an amount in excess of the minimum jurisdictional limits of this Court.

190.    In addition, Defendant Insurers undertook these actions with actual malice toward Plaintiffs or with a conscious, reckless and outrageous indifference to the health and welfare of Plaintiffs, and Plaintiffs are therefore entitled to recover punitive damages in an amount to be determined at trial in excess of the minimum jurisdictional limits of this Court.

## COUNT VIII

### (Breach Of Contract – Against RHA And RHIS)

191.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 190 of this Complaint as if fully set forth herein.

192.    Plaintiffs entered into contractual arrangements with RHA and RHIS pursuant to which these entities would select and obtain appropriate policies of property insurance for Plaintiffs.

193.    RHA and RHIS also agreed that any claims under the Policies would be submitted to them, and that they would competently, honestly, fairly and vigorously pursue those claims and the recoveries sought thereunder with the Defendant Insurers.

194.    RHA and RHIS knew and understood that Plaintiffs are involved in the hospitality, recreation, golf and property development industries.  RHA and RHIS knew or should have known that Plaintiffs' properties included historical landmarks.  RHA and RHIS knew or should have known that Plaintiffs' properties provided the significant majority, if not all, of Plaintiffs' income, that Plaintiffs are internationally known for the quality of their golf courses, and that those golf courses are an important part of Plaintiffs' reputations and incomes.

195.    RHA and RHIS knew or should have known that Plaintiffs would not purchase Policies that limited total recoveries for the Courses to $10 million.  RHA and RHIS knew or

48

should have known that Plaintiffs would not purchase Policies that required them to arbitrate any coverage issues in international forums, that required the use of English Barristers, and that required the application of English law.  RHA and RHIS committed errors and omissions in obtaining Policies that contravened these interests of Plaintiffs and grossly negligently failed to adequately disclose to Plaintiffs the existence of the offending provisions.

196.     By procuring policies of insurance that may not entirely cover all of Plaintiffs' damages and losses related to the Flood, by procuring policies of insurance that limited coverage for the Courses, by procuring policies that in some instances include international arbitrations provisions, and by failing to adequately assist Plaintiffs in receiving timely and full payment of Plaintiffs' claims, RHA and RHIS have breached their contractual obligations owed to Plaintiffs. As a direct and proximate cause of these breaches by RHA and RHIS, Plaintiffs have suffered damage in a total amount believed to be in excess of $107 million.

197.     Plaintiffs are therefore entitled to recover compensatory damages from Defendants RHA and RHIS, jointly and severally, arising from their breaches of their contractual obligations to Plaintiffs, the exact amount of which is estimated to be in excess of $75 million but which will be determined at trial in an amount in excess of the minimum jurisdictional limits of this Court.

## COUNT IX

### (Breach Of Implied Covenant Of Good Faith, Honesty And Fair Dealing – Against RHA And RHIS)

198.     Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 197 of this Complaint as if fully set forth herein.

199.     At all times relevant herein, and since at least March 2016, when Plaintiffs and RHA and RHIS entered into the contractual agreements referenced in Count VIII, *supra*, there was imposed upon RHA and RHIS an implied covenant of good faith, honesty and fair dealing in favor of Plaintiffs.

200.     This implied covenant of good faith and fair dealing required that RHA and RHIS act in the best interest of Plaintiffs with respect to the policies procured by these Defendants for Plaintiffs and with respect to the claims asserted by Plaintiffs against the Policies.

201.     Defendants RHA and RHIS breached the implied covenant of good faith, honesty and fair dealing by procuring policies of insurance that may not cover all of Plaintiffs' damages and losses related to the Flood, by procuring policies of insurance that limited coverage for the Courses, by procuring policies that in some instances include international arbitrations provisions, and by failing to adequately assist Plaintiffs in receiving timely and full payment of their claims.

202.     As a direct and proximate result of these Defendants' breaches of the implied covenant of good faith, honesty and fair dealing, Plaintiffs have suffered and will continue to suffer financial losses and losses to their prospective business advantages, and RHA and RHIS have wrongfully benefitted.

203.    Plaintiffs are therefore entitled to recover compensatory damages from RHA and

RHIS, jointly and severally, arising from their breaches of the implied covenant of good faith,

honesty and fair dealing, the exact amount of which is estimated to be in excess of $75 million

and which will be determined at trial in an amount in excess of the minimum jurisdictional limits

of this Court.

## COUNT X

### (Negligent And Grossly Negligent Misrepresentations – Against RHA And RHIS)

204.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1

through 203 of this Complaint as if fully set forth herein.

205.    In procuring the Policies for Plaintiffs, RHA and RHIS had a duty to not supply or

make false, misleading, inaccurate or incomplete representations to the Plaintiffs.

206.    RHA and RHIS had a pecuniary interest in obtaining and maintaining Plaintiffs'

businesses and were obligated to exercise reasonable care and competence in communicating

with Plaintiffs and in procuring the Policies.

207.    In particular, RHA and RHIS knew or should have known that Plaintiffs are

involved in the hospitality, recreation, golf and property development industries, that Plaintiffs'

properties included historical landmarks, that Plaintiffs' properties provided the significant

majority, if not all, of their income, that Plaintiffs are internationally known for the quality of

their golf courses, and that those golf courses are an important part of Plaintiffs' reputations and

incomes.

208.    RHA and RHIS knew or should have known that Plaintiffs would not purchase

Policies that limited total recoveries for the Courses to $10 million.  RHA and RHIS knew or

should have known that Plaintiffs would not purchase Policies that required them to arbitrate any coverage issues in international forums, that required the use of English Barristers, and that required the application of English law. Finally, RHA and RHIS knew or should have known that Plaintiffs believed RHA and RHIS held this knowledge about Plaintiffs and that Plaintiffs would rely upon RHA and RHIS to utilize that knowledge and expertise in obtaining appropriate policies of property insurance.

209.    RHA and RHIS instead procured policies of insurance that may or may not provide full coverage for Plaintiffs' damages and losses and that in some instances include international arbitration provisions. This information about the Policies was material to Plaintiffs, and RHA and RHIS downplayed, concealed and misrepresented that the Policies might not provide the required coverage and that certain of the Policies included international arbitration policies, even going so far as to withhold the Policies from Plaintiffs until certain of Plaintiffs filed suit to obtain copies of the Policies.

210.    Plaintiffs relied on the grossly negligent or recklessly-made misrepresentations of RHA and RHIS that the Policies were adequate for Plaintiffs' needs, would not unreasonably limit coverage for the Courses, and would not require Plaintiffs to arbitrate in an international forum using English Barristers and the application of English law in the event of disputes under the Policies.

211.    As a direct and proximate result of such grossly negligent and reckless misrepresentations, Plaintiffs have been damaged and are entitled to recover compensatory damages from RHA and RHIS, jointly and severally, the exact amount of which is estimated to

be in excess of $75 million but which will be determined at trial in an amount in excess of the minimum jurisdictional limits of this Court.

212.    In addition, RHA and RHIS acted with actual malice toward Plaintiffs or with a conscious, reckless and outrageous indifference to the welfare of Plaintiffs, and Plaintiffs are therefore entitled to recover punitive damages in an amount to be determined at trial in excess of the minimum jurisdictional limits of this Court.

## COUNT XI

### (Breach Of Contract – Against Bankers)

213.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 212 of this Complaint as if fully set forth herein.

214.    Plaintiffs entered into a contractual arrangement with Bankers pursuant to which Bankers, in conjunction with RHA and RHIS, would select and obtain appropriate policies of property insurance for Plaintiffs.

215.    Bankers knew and understood that Plaintiffs are involved in the hospitality, recreation, golf and property development industries.  Bankers knew or should have known that Plaintiffs' properties included historical landmarks.  Bankers knew or should have known that Plaintiffs' properties provided the significant majority, if not all, of their income, that Plaintiffs are internationally known for the quality of their golf courses, and that those golf courses are an important part of Plaintiffs' reputations and incomes.

216.    Bankers knew or should have known that Plaintiffs would not purchase Policies that limited total recoveries for the Courses to $10 million.  Bankers knew or should have known that Plaintiffs would not purchase Policies that required them to arbitrate any coverage issues in

53

international forums, that required the use of English Barristers, and that required the application

of English law.  Bankers committed errors and omissions in obtaining Policies that contravened

these interests of Plaintiffs and grossly negligently failed to adequately disclose to Plaintiffs the

existence of the offending provisions.

217.    By participating in the procurement of policies of insurance that may not cover all

of Plaintiffs' damages and losses related to the Flood, by participating in the procurement of

policies of insurance that limited coverage for the Courses, and by participating in the

procurement of policies of insurance that in some instances include international arbitration

provisions, Bankers has breached its contractual obligations owed to Plaintiffs.  As a direct and

proximate cause of these breaches by Bankers, Plaintiffs have suffered damage in an amount

believed to be in excess of $107 million.

218.    Plaintiffs are therefore entitled to recover compensatory damages from Bankers

arising from its breaches of its contractual obligations to them, the exact amount of which is

estimated to be in excess of $75 million but which will be determined at trial in an amount in

excess of the minimum jurisdictional limits of this Court.

## COUNT XII

### (Breach Of Implied Covenant Of Good Faith, Honesty And Fair Dealing – Against Bankers)

219.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1

through 218 of this Complaint as if fully set forth herein.

220.    At all times relevant herein, and since at least March 2016, when Plaintiffs and

Bankers entered into the contractual agreements referenced in Count XI, *supra*, there was

imposed upon Bankers an implied covenant of good faith, honesty and fair dealing in favor of Plaintiffs.

221.    This implied covenant of good faith and fair dealing required that Bankers act in the best interest of Plaintiffs with respect to the policies procured by Bankers, in conjunction with RHA and RHIS.

222.    Bankers breached the implied covenant of good faith, honesty and fair dealing by procuring policies of insurance in conjunction with RHA and RHIS that may not cover all of Plaintiffs' damages and losses related to the Flood, by procuring policies of insurance in conjunction with RHA and RHIS that limited coverage for the Courses, and by procuring policies of insurance that in some instances include international arbitrations provisions and by failing to in good faith and honestly disclose and provide such information to Plaintiffs.

223.    As a direct and proximate result of Bankers' breaches of the implied covenant of good faith, honesty and fair dealing, Plaintiffs have suffered and will continue to suffer financial losses and losses to their prospective business advantages, and Bankers has wrongfully benefitted.

224.    Plaintiffs are therefore entitled to recover compensatory damages from Bankers arising from its breaches of the implied covenant of good faith, honesty and fair dealing, the exact amount of which is estimated to be in excess of $75 million but which will be determined at trial in an amount in excess of the minimum jurisdictional limits of this Court.

## COUNT XIII

### (Breach Of The Duty Of Good Faith, Honesty And Fair Dealing – Against Vericlaim)

225.     Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 224 of this Complaint as if fully set forth herein.

226.     At all times relevant herein, and since at least March 2016 when Vericlaim was retained/appointed to act as the designated loss adjuster for Plaintiffs' claims, there was imposed upon Vericlaim an duty of good faith and fair dealing in favor of Plaintiffs.

227.     This duty of good faith, honesty and fair dealing required that Vericlaim act in the best interest of Plaintiffs with respect to the claims asserted against the Policies by Plaintiffs.

228.     Vericlaim breached the implied covenant of good faith, honesty and fair dealing by understating certain of Plaintiffs' claims, by wrongfully determining that other of Plaintiffs' claims were not covered by the Policies and by recommending that Defendant Insurers adopt these findings in responding to and negotiating Plaintiffs' claims.

229.     As a direct and proximate result of Vericlaim's breaches of the duty of good faith, honesty and fair dealing it owed to Plaintiffs, they have suffered and will continue to suffer financial losses and losses to their prospective business advantages, and Vericlaim has wrongfully benefitted.

230.     Plaintiffs are therefore entitled to recover compensatory damages from Vericlaim arising from its breaches of the duty of good faith and fair dealing, the exact amount of which is estimated to be in excess of $75 million but which will be determined at trial in an amount in excess of the minimum jurisdictional limits of this Court.

WHEREFORE, Plaintiffs respectfully request Judgment on their Complaint herein as follows:

A.    Declaratory Judgments pursuant to 28 U.S.C. §2201(a) on Count I as follows:

     i.    declaring that the Policies provide full coverage for Plaintiffs' claims;

    ii.    declaring that Defendant Insurers' failure and refusal to pay Plaintiffs' claims in full and as presented, and their assertion that certain of Plaintiffs' damages and losses are not covered by the Policies, were undertaken and asserted in bad faith and in violation of W. Va. Code §§ 33-11-4(9), *et seq.*, and that Plaintiffs are therefore also entitled to recover damages that include, but are not limited to, consequential damages, net economic losses, aggravation, inconvenience and their reasonable attorney fees in bringing this action; and

   iii.    declaring that, in the event Plaintiffs substantially prevail in the instant coverage dispute, they are entitled to recover from Defendant Insurers all damages available to Plaintiffs under the law as set forth in *Hayseeds, Inc. v State Farm Fire & Cas.*, 352 S.E.2d 73 (W. Va. 1986), *Miller v. Fluharty*, 500 S.E.2d 310 (W. Va. 1997), and their progeny, including but not limited to damages arising from the aggravation and inconvenience experienced by Plaintiffs and their principals, including James C. Justice, II, related to Defendant Insurers' failure and refusal to timely pay Plaintiffs' claims in full and as presented.

B.      A Judgment on Count II for compensatory damages against Defendants Insurers, each in amounts proportional to the extent of their coverage vis-à-vis the $600 million total coverage, for breach of contract;

C.      A Judgment on Count III for compensatory damages against Defendant Insurers, each in amounts proportional to the extent of their coverage vis-à-vis the $600 million total coverage, for breach of the implied duty of good faith, honesty and fair dealing;

D.      A Judgment on Count IV for compensatory, consequential and punitive damages, in separate amounts, against Defendant Insurers, each in amounts proportional to the extent of their coverage vis-à-vis the $600 million total coverage, for violations of the West Virginia Unfair Trade Practices Act;

E.      A Judgment on Count V for compensatory and punitive damages, in separate amounts, against Defendants Insurers, each in amounts proportional to the extent of their coverage vis-à-vis the $600 million total coverage, for common law bad faith;

F.      A Judgment on Count VI for compensatory and punitive damages, in separate amounts, against Defendant Insurers, each in amounts proportional to the extent of their coverage vis-à-vis the $600 million total coverage, for interference with existing and prospective business advantages;

G.      A Judgment on Count VII for compensatory and punitive damages, in separate amounts, against Defendant Insurers, each in amounts proportional to the extent of their coverage vis-à-vis the $600 million total coverage, for tortious interference with contractual relations;

H.      A Judgment on Count VIII for compensatory damages against RHA and RHIS, jointly and severally, for breach of contract;

I.      A Judgment on Count IX for compensatory damages against RHA and RHIS, jointly and severally, for breach of the implied covenant of good faith, honesty and fair dealing;

J.      A Judgment on Count X for compensatory and punitive damages, in separate amounts, against RHA and RHIS, jointly and severally, for negligent and grossly negligent misrepresentations;

K.      A Judgment on Count XI for compensatory damages against Bankers for breach of contract;

L.      A Judgment on Count XII for compensatory damages against Bankers for breach of the implied covenant of good faith, honesty and fair dealing;

M.      A Judgment on Count XIII for compensatory damages against Vericlaim for breach of the duty of good faith, honesty and fair dealing;

N.      An award of the reasonable attorney fees and expenses that Plaintiffs incurred in the course of this coverage dispute, together with damages for aggravation and inconvenience, and all further relief available to a policyholder who substantially prevails against its insurer, including but not limited to damages arising from the aggravation and inconvenience experienced by Plaintiffs and their principals, including James C. Justice, II, related to Defendant Insurers' failure and refusal to timely pay Plaintiffs' claims in full and as presented;

O.      An Order upon demand to compel arbitration pursuant to each Policy that includes an arbitration provision;

P.      A docket preference expediting these proceedings in accordance with Rule 57 of

the Federal Rules of Civil Procedure;

Q.      A reasonable attorney's fee;

R.      Trial by jury on all counts so triable; and

S.      Such further relief as Plaintiffs appear entitled, in addition to the costs and

disbursements of this action.

                                    Respectfully submitted,

                                    /s/ Michael W. Carey
                                    MICHAEL W. CAREY, WVSB No. 635
                                    JOHN A. KESSLER, WVSB No. 2027
                                    CAREY, SCOTT, DOUGLAS & KESSLER, PLLC
                                    901 Chase Tower, 706 Virginia Street, East (25301)
                                    P.O. Box 913
                                    Charleston, West Virginia 25323
                                    Telephone:  (304) 345-1234
                                    Facsimile:  (304) 342-1105
                                    mwcarey@csdlawfirm.com
                                    jkessler@csdlawfirm.com

                                    and

                                    RICHARD A. GETTY
                                    (*Pro Hac Vice* Admission to be filed)
                                            and
                                    DANIELLE HARLAN
                                    (*Pro Hac Vice* Admission to be filed)

                                    THE GETTY LAW GROUP, PLLC
                                    1900 Lexington Financial Center
                                    250 West Main Street
                                    Lexington, Kentucky  40507
                                    Telephone: (859) 259-1900
                                    Facsimile:  (859) 259-1909
                                    rgetty@gettylawgroup.com
                                    dharlan@gettylawgroup.com

                                    and

LAURENCE J. ZIELKE
(*Pro Hac Vice* Admission to be filed)
   and
JANICE THERIOT
(*Pro Hac Vice* Admission to be filed)

ZIELKE LAW FIRM, PLLC
462 S. 4th St.
Suite 1250
Louisville, Kentucky 40202
Telephone:  (502) 589-4600
lzielke@zielkefirm.com
jtheriot@zielkefirm.com

COUNSEL FOR PLAINTIFFS, GREENBRIER
HOTEL CORPORATION, THE GREENBRIER
SPORTING CLUB, INC., GREENBRIER
SPORTING CLUB DEVELOPMENT COMPANY,
INC., OLD WHITE CHARITIES, INC.,
OAKHURST CLUB LLC, GREENBRIER GOLF
AND TENNIS CLUB CORPORATION, JUSTICE
FAMILY GROUP, LLC, THE CHESAPEAKE &
OHIO TRAVELER, INC., THE GREENBRIER
RESORT & CLUB MANAGEMENT CO.,
GREENBRIER IA, INC., OLD WHITE CLUB
CORPORATION, AND GREENBRIER
MEDICAL INSTITUTE, LLC

dhbpld2131a